IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 21, 2021

## JOSEPH SANFORD McNAIR, JR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 108077   Kyle A. Hixson, Judge**

_____

**No. E2021-00219-CCA-R3-PC**
_____

The Petitioner, Joseph Sanford McNair, Jr., filed a petition for post-conviction relief from his convictions of possession of cocaine with intent to deliver, possession of cocaine with intent to sell, and possession of marijuana and the accompanying effective twelve-year sentence. In the petition, the Petitioner alleged that trial counsel was ineffective (1) by failing to pursue a Sixth Amendment claim regarding the racial composition of the jury pool; (2) by failing to pursue a claim regarding the "constructive amendment in the indictment"; and (3) by failing to fully pursue the Petitioner's Fourth Amendment rights during a motion to suppress. The Petitioner also raises two free-standing claims: (1) his Sixth Amendment right to a jury composed of a fair cross-section of the community was violated because black people were underrepresented in the jury pool; and (2) his rights against double jeopardy were violated when the trial court allowed the indictment to be constructively amended after the jury rendered its verdict. The post-conviction court denied the petition, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the Appellant, Joseph Sanford McNair, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Jordan H. Murray and Sean F. McDermott, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

# I.  Factual Background

On direct appeal, this court summarized the facts adduced at trial as follows:

This case relates to the seizure of approximately 36 grams of crack cocaine during a police encounter with the [Petitioner].  At the trial, Knoxville Police Officer Brian Baldwin testified that on December 8, 2009, at 1:30 p.m., he and Officer Brandon Stryker were parked in their respective police cruisers at the corner of Minnesota and Sherman Avenues near a park when he saw an Oldsmobile with very dark windows traveling eastbound.  The entire front windshield was tinted.  Officer Baldwin followed the Oldsmobile and saw it turn left into a residence on Minnesota Avenue, and he "pulled [his] police car all the way in."  Officer Stryker parked his police cruiser beside Officer[] Baldwin's police cruiser.  As Officer Baldwin exited his car, the [Petitioner] exited the driver's door of the Oldsmobile.  Officer Baldwin and the [Petitioner] made eye contact, and the [Petitioner] removed a leather jacket he was wearing, placed it inside the car, and closed the door.  The [Petitioner] walked toward Officer Baldwin, and Officer Baldwin identified himself and told the [Petitioner] he stopped him because of excessive window tint. The [Petitioner] was unable to provide identification, and Officer Baldwin went to his cruiser to verify the [Petitioner's] identity while Officer Stryker remained with the [Petitioner].

Officer Baldwin testified that he returned to the [Petitioner] and Officer Stryker and that he asked the [Petitioner] if anything illegal was inside the car and requested permission to search the car.  The [Petitioner] consented to a search of the car, unlocked the passenger-side door, and offered to unlock the trunk.  During the search, Officer Baldwin found two bags of what he believed was crack cocaine and one bag of marijuana inside a pocket of the leather jacket the [Petitioner] removed previously.  He placed the [Petitioner] under arrest and continued the search.  Inside the trunk, Officer Baldwin found digital scales with what he believed was cocaine residue.  Officer Baldwin said the [Petitioner] did not display any signs of being a cocaine user and was not intoxicated, and he did not request the [Petitioner] perform

field sobriety tests. He found no pipes, syringes, or other paraphernalia used to ingest crack cocaine inside the car.

Officer Baldwin described photographs taken at the scene, which depicted the Oldsmobile, the crack cocaine, the marijuana, the scales, and the leather jacket. Relative to the photograph of the car driven by the [Petitioner], Officer Baldwin noted that Sam E. Hill Preschool was in the background. Officer Baldwin weighed the crack cocaine at the scene, and a photograph of the police-issued scales showed a total weight of 36.2 grams. Officer Baldwin weighed the marijuana at the scene, and a photograph of the police-issued scales showed a total weight of 1.9 grams. A photograph of the scales found inside the trunk showed a white residue. Another photograph showed $233 in cash in the [Petitioner's] possession. Another photograph showed a comparison between the car door window tint and the state-issued tint card. Officer Baldwin stated that he measured the distance between the [Petitioner's] car and the preschool property, which was 74 feet.

On cross-examination, Officer Baldwin . . . agreed Aaron Roper was the registered owner of the car. . . .

Knoxville Police Officer Brandon Stryker, an expert in the field of drug trafficking investigations, testified that on December 8, 2009, he and Officer Baldwin were parked in their respective police cruisers near Brittany Daniels Park at the intersection of Sherman and Minnesota Avenues. He observed the car driven by the [Petitioner] turn onto Minnesota Avenue and said that Officer Baldwin followed the car and that he followed Officer Baldwin. Officer Baldwin stopped the car, and Officer Stryker provided assistance. Officer Stryker said the [Petitioner] parked the car at 1715 Minnesota Avenue.

Officer Stryker testified that the [Petitioner] consented to a search of the car. Officer Stryker identified the white substance found inside the car as crack cocaine. . . . He agreed the crack cocaine found inside the [Petitioner's] jacket weighed 36.2 grams . . . . He explained that crack cocaine was usually smoked using a "crack pipe" and said no pipe was found in the [Petitioner's] possession or inside his car.

. . . .

Tennessee Bureau of Investigation (TBI) Special Agent Sharon Norman, an expert in forensic chemistry, testified that she analyzed the substances in this case. She concluded that the white, rock-like substance contained cocaine base and weighed 35.9 grams. . . . Relative to the plant material, she concluded that the substance was marijuana and weighed 0.8 grams.

. . . .

The [Petitioner] testified that he was not a drug dealer and that he had never sold drugs, although he had purchased drugs. He said that on December 8, 2009, the police stopped him after he arrived at Kevin Thronberg's residence on Minnesota Avenue. He said Jay Rock asked him to pick up the Oldsmobile and drive it to Mr. Thronberg's residence because Mr. Rock was incarcerated and because Mr. Rock's girlfriend was moving and did not want the car towed. He denied previously driving or being inside the car and said he did not inspect the car before driving it. He denied owning the scales found inside the trunk and knowing the scales were there.

The [Petitioner] testified that although he was employed at the time of the trial, he was only "working . . . jobs from here to there" at the time of his arrest, including concrete-related work and cooking at a restaurant. In 2009, he lived with his fiancée, who supported him.

The [Petitioner] admitted he possessed about one ounce of crack cocaine on the day of his arrest. Regarding the large amount, he stated that sometimes the quality of crack cocaine was poor and that he needed a larger amount to "get a good high[.]" He said he paid about $400 for it on the day of his arrest. He denied that he would have paid more if the crack cocaine would have been divided into "little tiny quantities." He said he paid for the crack cocaine with money provided to him by his father. He said he bought the crack cocaine from someone he knew as "C. Bone" about ten minutes before the officers stopped him. He met C. Bone to obtain the drugs at

the location where he picked up Mr. Rock's car. He said that he intended to "get[ ] high" with the crack cocaine but that the items he planned to use to ingest it were inside the residence where the police stopped him.

The [Petitioner] testified that he had purchased crack cocaine fifteen times previously and that the largest quantity he had purchased was worth about $280 to $290. He said that the quality of the drugs he bought on December 8 was poor and that the drugs would have lasted him about one day. He said he stopped using drugs in 2009 because his drug use hurt his family.

On cross-examination, the [Petitioner] testified that he was driving the Oldsmobile, that the police stopped him when he was in the car, that he parked the car at the location identified by Officers Baldwin and Stryker, and that he was wearing a leather jacket, which he removed and placed inside the car. The [Petitioner] agreed that Sam E. Hill Preschool was nearby and identified the preschool's swings and jungle gym in a previously admitted photograph. Although the [Petitioner] did not know the distance between the car and the preschool, he agreed the distance was within 1000 feet. The [Petitioner] admitted that he possessed the crack cocaine and that it was a large amount. He said he had no reason to dispute the crack cocaine weighed 36 grams. However, he denied ownership of the marijuana. He did not know the origin of the marijuana, although he admitted the leather jacket in which it was found was his.

. . . .

On redirect examination, the [Petitioner] testified that several years had passed since his arrest and that it was possible he did not remember every detail. He said that the quality of the crack cocaine he possessed required "about five hits" for an adequate high but that good quality crack cocaine required less. He said he planned to consume the crack cocaine with his friends but denied he planned to sell it to them. On recross-examination, he stated that all crack cocaine users shared their drugs. He said he usually handed the pipe to his friends after

- 5 -

he took the first hit, but he denied he was delivering crack
cocaine to another person and equated it to "casual exchange."

State v. Joseph Sanford McNair, Jr., No. E2014-00916-CCA-R3-CD, 2015 WL 12978200, at *1-5 (Tenn. Crim. App. at Knoxville, Feb. 25, 2015).

The Petitioner was convicted of possession of cocaine with intent to sell within a drug-free school zone, a Class B felony; possession of cocaine with intent to deliver within a drug-free school zone, a Class B felony; and possession of marijuana, a Class A misdemeanor. Id. The felony convictions were merged, and the Petitioner received a total effective sentence of twelve years, one hundred percent of which he was required to serve in confinement. Id. On direct appeal, the Petitioner challenged the sufficiency of the evidence sustaining his convictions and the denial of his motion to suppress. Id. This court affirmed the Petitioner's convictions.

Thereafter, the Petitioner filed a petition for post-conviction relief alleging that trial counsel was ineffective (1) by failing to pursue a Sixth Amendment claim regarding the racial composition of the jury pool; (2) by failing to pursue a claim regarding the "constructive amendment in the indictment"; and (3) by failing to fully pursue the Petitioner's Fourth Amendment rights during a motion to suppress. The Petitioner also raised two free-standing claims: (1) his Sixth Amendment right to a jury composed of a fair cross-section of the community was violated because black people were underrepresented in the jury pool; and (2) his rights against double jeopardy were violated when the trial court allowed the indictment to be constructively amended after the jury rendered its verdict.

At the post-conviction hearing, the Petitioner testified that trial counsel had represented him from "the beginning" and that they met approximately five times prior to trial. The Petitioner said that trial counsel did not provide him with the discovery but acknowledged that trial counsel gave him a compact disc (CD) on which eight photographs were stored. Trial counsel also showed the Petitioner a video recording "supposedly" showing the officer pulling over his vehicle for a window tint violation; however, trial counsel never gave the Petitioner a copy of the video. Regarding trial counsel, the Petitioner said that "everything was looking good in the beginning" but that approximately one or one and a half years later, "everything" began "looking differently." The Petitioner noted that the State repeatedly offered to allow the Petitioner to plead guilty and receive a sentence of sixteen years, one hundred percent of which he would have to serve in confinement. The Petitioner refused the plea offer, maintaining that he was innocent of the charges.

The Petitioner claimed that Officer Baldwin had not "pulled over" the Petitioner but had "pulled onto" the Petitioner's private property without a warrant. At the suppression

hearing, Officer Baldwin testified that he had followed the Petitioner onto the property. The Petitioner contended that "once [Officer Baldwin] pulled onto my property he was trespassing." The Petitioner said that he was not in the car when the officer drove into the driveway. Instead, the Petitioner approached Officer Baldwin's car when Officer Baldwin pulled into his driveway. Officer Baldwin told the Petitioner he wanted to ask about the window tint on the vehicle. The Petitioner responded that he did not know anything about the window tint because the car did not belong to him.

The Petitioner complained that Officer Baldwin did not check the darkness of the window tint with a "window tint card" as required. Instead, Officer Baldwin merely looked at the window and determined that it was too dark. Officer Baldwin asked the Petitioner for identification. The Petitioner responded that he had identification but that he did not have a driver's license. Officer Baldwin asked if he could "take a look in the car." The Petitioner thought Officer Baldwin meant "look with your eyes . . . . He didn't never ask to search." The Petitioner told Officer Baldwin, "I don't mind you taking a look in the car, but the car is not mine." The Petitioner said Officer Baldwin lost interest in the window tint and never issued the Petitioner a citation for the window tint. Officer Baldwin also never obtained a warrant to search the car or the house.

The Petitioner said that he told trial counsel about the circumstances surrounding the search of the car. Trial counsel filed a motion to suppress the evidence found as a result of the search of the car. The Petitioner recalled that at the suppression hearing, trial counsel and the district attorney debated whether stopping someone for a window tint violation was legal. Ultimately, the motion was unsuccessful. The Petitioner could not recall whether the denial of his motion to suppress was raised on direct appeal. The Petitioner thought trial counsel failed to preserve the Petitioner's Fourth Amendment rights and argue his Fourth Amendment claims "to the fullest" and agreed that counsel failed to "vigorously litigat[e]" his Fourth Amendment issues. The Petitioner said that counsel's actions harmed him "[m]entally[ and p]hysically" because he was incarcerated due to a "fraudulent stop."

The Petitioner contended that the jury pool did not represent a fair cross-section of the community, noting that out of thirty or forty people in the jury pool, only one person was black. The black juror was one of the people chosen, but she was excused after she informed the trial court that she had gone to school with the Petitioner's aunt. The Petitioner acknowledged he did not tell trial counsel he was concerned that only one person in the jury pool was black. The Petitioner explained that it was his first trial and that he thought everything was proceeding as it should. Trial counsel advised the Petitioner that "by me being a black man going against an all-white jury, I was guaranteed to lose." However, trial counsel did not raise an objection.

The Petitioner also maintained that his due process rights were violated and that trial counsel was ineffective by failing to object to a "constructive amendment in the indictment

- 7 -

or a change in the indictment after jeopardy had attached." The Petitioner recalled that immediately prior to trial, the State dismissed the charge related to the window tint violation and the charge of driving on a suspended license. The Petitioner said that he was "filled with joy" because he thought that without the window tint charges, the State had no "probable cause" and could not proceed on the remaining charges. However, the trial court allowed the trial on the remaining charges to proceed.

The Petitioner said that after the jury returned a guilty verdict on the remaining four counts of the indictment, the prosecutor told the trial court that "they forgot to add the school zone." The trial court ascertained that the drug-free school zone enhancement was included in the jury instructions and the indictment but that the jury had failed to determine whether the possession of cocaine charges were committed within a drug-free school zone. The trial court then had the verdict form retyped to include that enhancement factor, and the jury was returned to the deliberation room to render a verdict on the enhancement factor. The Petitioner complained that the jury did not redeliberate on the simple possession and drug paraphernalia counts when they deliberated on the drug-free school zone enhancement.

The Petitioner maintained that the judgment forms did not "match up with the jury verdict form of what the jury found me guilty on."[1] The Petitioner explained that the jury verdict form reflected that Count 1 was simple possession but that the judgment of conviction reflected that simple possession was Count 3. The Petitioner acknowledged that although the numbers did not match, "the charge does match." The Petitioner complains that the jury was not informed of Counts 5 or 6. However, the judgments of conviction reflected that he was convicted of Counts 5 and 6, which were the possession of cocaine with intent to sell and possession of cocaine with intent to deliver charges, respectively. The Petitioner said that he did not discuss with trial counsel his concerns regarding the inconsistent numbering on the judgments of conviction; however, he did discuss his concerns with appellate counsel, who also handled the motion for new trial and the direct appeal. Appellate counsel told the Petitioner that he did not see anything wrong with the judgments of conviction.

---

[1]The Petitioner's direct appeal record reflects that the indictment charged the Petitioner in Count 1 with a window tint violation, in Count 2 with driving on a suspended license, in Count 3 with simple possession of marijuana, in Count 4 with possession of drug paraphernalia, in Count 5 with possession of .5 grams of cocaine or more with the intent to sell within a drug-free school zone, and in Count 6 with possession of .5 grams of cocaine or more with the intent to deliver within a drug-free school zone. The minutes for the first day of the Petitioner's trial reflect that "[o]n recommendation of the Attorney General Counts 1 and 2 are hereby dismissed and the remaining counts are renumbered." The judgments of conviction reflect that the Petitioner was found guilty on Count 3 of simple possession, on Count 5 with possession of .5 grams of cocaine or more with the intent to sell within a drug-free school zone, and on Count 6 with possession of .5 grams of cocaine or more with the intent to deliver within a drug-free school zone.

In a related complaint, the Petitioner contended that he was charged under two indictments in case number 94084, a four-count indictment and a six-count indictment. The Petitioner maintained that he went to trial on the four-count indictment but that the "six count is what they sent me to prison on." The Petitioner asserted that from his research, "it's impossible to have two indictments with the same docket number."

On cross-examination, the Petitioner acknowledged that in his post-conviction petition, he provided statistics about the racial composition of Knox County but conceded that he did not recall the source or timeframe of the statistical information. The Petitioner admitted that he had no information "regarding any sort of systemic exclusion" of black people from the jury pool and stated that he was "going off what happened in my case and also what I've researched during the time that I've been incarcerated."

The Petitioner acknowledged that prior to trial, the State dismissed the violation of the window tint law and the violation of the driver's license law charges. The State suggested that dismissal led to the charges being renumbered at trial, which could have confused the Petitioner. The Petitioner reluctantly agreed. The Petitioner complained that because the jury was not in the courtroom when the charges were dismissed, they were "in the blind about the probable cause of the window tint and the driver's license being dismissed."

The Petitioner acknowledged that he "[s]ort of" remembered a motion to amend the indictment. The Petitioner stated that his complaints regarding a constructive amendment of the indictment did not refer to the jury's having to return to deliberate regarding whether the offenses were committed within a drug-free school zone or to determine the amount of cocaine the Petitioner possessed. The Petitioner said his complaint instead referred to "the indictment being changed without [his] consent" after jeopardy had attached. The Petitioner explained, "[T]he charges changed from where they was at, because Count 1 now is simple possession. . . . And it wasn't simple possession. Count 1 was window tint violation on the original indictment." The Petitioner asserted, "I'm not talking about the numbers. I'm just talking about the indictment being changed period." When asked to explain his specific complaints with the indictment other than the numbering, the Petitioner said, "The window tint has gone. That's the probable cause. If there's no . . . probable cause, there's nothing."

The Petitioner said that his complaint that the trial court "allowed the amendment of the verdict form after the jury had already made its verdict" referenced the jury's returning to deliberate the drug-free school zone enhancement factor. The Petitioner agreed that after the jury announced its original verdict, the prosecutor raised questions regarding the drug-free school zone enhancement factor. The jury was then returned to the jury room to deliberate that enhancement factor. After its deliberations, the jury reread the

prior verdict and included its verdict on the drug-free school zone enhancement factor and the amount of cocaine involved.

Trial counsel testified that he had practiced law for eleven years and that his practice primarily was criminal defense. Trial counsel was appointed to represent the Petitioner in general sessions court. Prior to trial, trial counsel met with the Petitioner several times and reviewed the discovery with him. Trial counsel also reviewed the video from the police cruiser showing the stop and search of the vehicle and the Petitioner. Trial counsel attempted plea negotiations, which were unsuccessful.

Trial counsel filed approximately a dozen pretrial motions, including an unsuccessful motion to suppress and an amended motion to suppress. Trial counsel argued at the suppression hearing that Officer Baldwin's intent for the stop from the beginning was to search for drugs and that he never intended to investigate the window tint. Trial counsel noted that Officer Baldwin did not have a window tint card in his patrol car to compare with the window tint on the vehicle. Trial counsel contended that if Officer Baldwin had intended to investigate the window tint, he should have immediately investigated that issue. Trial counsel maintained that once Officer Baldwin determined the window tint was not a violation, the seizure should have ended, so any continuation of the seizure at that point was illegal. Trial counsel also argued that an illegal search had been conducted before the officers obtained the Petitioner's consent to search the vehicle and that any evidence found thereafter was "fruit of the poisonous tree."

Trial counsel said that after the motion to suppress was denied, he advised the Petitioner it would be difficult to be successful at trial and that they should consider a plea agreement. Nevertheless, the case proceeded to trial. Because of the time that had elapsed since the trial, trial counsel could not recall the specific trial strategy they employed. He recalled attacking the evidence introduced by Officer Baldwin and calling into question the location where the incident occurred in order to challenge the drug-free school zone enhancement factor.

Trial counsel and another attorney from his firm sat down with the Petitioner and discussed the "possible benefits or consequences of testifying," and trial counsel tried to prepare the Petitioner for trial. Trial counsel thought the Petitioner had testified that "it was not his cocaine, that he had borrowed the vehicle from someone else, and that the jacket that the cocaine was found in was already there in the car and that he had been sitting – he just sat on the jacket . . . ."

Trial counsel said that the dismissal of the two counts at the beginning of trial had no significant effect on his trial strategy because the trial court had already ruled on the suppression issue and whether probable cause existed to justify the stop. Trial counsel thought making the same arguments at trial that he did at the suppression hearing would

have been inappropriate. Trial counsel did not recall whether he objected when the jury was sent back after the verdict was announced to determine the amount of cocaine possessed by the Petitioner and whether the possession of cocaine offenses were committed within a drug-free school zone.

On cross-examination, trial counsel could not recall how many people were in the jury pool and could not confirm or dispute the Petitioner's estimate that it consisted of thirty or forty people. Trial counsel did not think the "juror information sheets" reflected the race or ethnicity of each juror. Trial counsel thought two black people were in the jury pool and that one black person was chosen for the jury. The black juror ultimately was dismissed at the Petitioner's request. Trial counsel and the Petitioner did not discuss whether the jury pool should include more black people. Trial counsel and the Petitioner discussed the difficulty of the Petitioner, who was black, being tried by an all-white jury, but trial counsel asserted that the Petitioner "ultimately decided that he still wanted to strike her." Trial counsel recalled that the jurors were asked whether they knew the Petitioner or any of his family members. The black juror responded "that she drove the KAT bus and that she believed she recognized [the Petitioner] from her bus route." Trial counsel did not recall whether the juror stated she knew one of the Petitioner's family members but stated that he would not dispute that information if it was consistent with what the transcript showed.[2] Trial counsel did not recall discussing the possibility of requesting additional jury panels so that more black people would be in the jury pool.

In rebuttal, the Petitioner testified that the black juror stated that she "went to school with [the Petitioner's] aunties." The Petitioner stated that he wanted the juror to remain. The Petitioner opined that having black people on the jury would have been useful.

The post-conviction court denied the post-conviction petition, holding that the Petitioner failed to prove his claims by clear and convincing evidence. On appeal, the Petitioner challenges the ruling of the post-conviction court.

## II. Analysis

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be

---

[2]No transcript of the jury selection was included in the appellate record for our review.

resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Initially, we note that on appeal, the Petitioner argues that the jury selected to hear his case did not reflect the racial composition of the community because black people were underrepresented. However, at the post-conviction hearing, the Petitioner focused on the racial composition of the jury pool. A party is bound by the evidentiary theory argued to the post-conviction court and may not change or add theories on appeal. State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). We are not required to address issues raised for the first time on appeal. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). Nevertheless, we will briefly address the Petitioner's concerns.

- 12 -

We note that a defendant is constitutionally entitled to a jury that is drawn from a "fair cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 527-28 (1975). Regardless, a defendant is "not entitled to a jury of any particular composition because the fair cross-section requirement does not impose a requirement that the jury actually chosen mirror the community or reflect the various distinctive groups in the population." State v. Hester, 324 S.W.3d 1, 39 (Tenn. 2010). In determining whether a jury was properly selected from a fair cross-section of the community, we utilize the three-pronged test set forth in Duren v. Missouri, 439 U.S. 357, 364 (1979), which states that the Petitioner must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;
> (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.

State v. Mann, 959 S.W.2d 503, 535 (Tenn. 1997) (citing Duren, 439 U.S. at 363) (footnote omitted).

We note that the Petitioner has raised this issue as both a free-standing claim and as a claim that counsel was ineffective by failing to pursue the issue at trial. The post-conviction court found that the Petitioner's free-standing claim regarding the composition of the jury pool was waived by his failure to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented. Tenn. Code Ann. § 40-30-106(g); Jarus Smith v. State, No. M2020-00816-CCA-R3-PC, 2021 WL 3674117, at *10 (Tenn. Crim. App. at Nashville, Aug. 19, 2021). We agree. Likewise, the Petitioner waived any free-standing claim regarding the composition of the petit jury by failing to present it in a proceeding before a court of competent jurisdiction in which the ground could have been presented. The Petitioner is not entitled to relief on this basis.

Regarding the ineffective assistance of counsel claim, the post-conviction court found that the Petitioner had failed to make a prima facie showing of the Duren factors. The post-conviction court held that, accordingly, the Petitioner had failed to prove that he was prejudiced by any alleged deficiency of counsel. The post-conviction court stated that by holding the Petitioner suffered no prejudice, the court did not need to determine whether counsel was deficient.

We agree that although "the Petitioner has alleged the exclusion of a distinctive group based on race, he has not alleged any sort of systematic exclusion." Josh L. Bowman

- 13 -

v. State, No. E2016-01028-CCA-R3-PC, 2017 WL 1449232, at \*8 (Tenn. Crim. App. at Knoxville, Apr. 24, 2017). The Petitioner's only proof on this issue was his testimony that he was a black person and that no black people served on his jury. Trial counsel testified that two black people were in the jury pool. The record before us reflects that the post-conviction court generally accredited the testimony of trial counsel. The post-conviction court found that one black person made it "into the box." However, after the black juror testified that she drove a bus and that she knew the Petitioner from her bus route, the Petitioner insisted that she be dismissed, even after trial counsel advised the Petitioner that the result would be an all-white jury. Although the Petitioner testified regarding the number of black people on the panel, he presented no proof regarding what percentage of the community was black. See id. (citing State v. Stephens, 264 S.W.3d 719, 733 (Tenn. Crim. App. 2007)). Therefore, we agree with the post-conviction court that the Petitioner has failed to establish any deficiency by trial counsel or that the Petitioner suffered any prejudice by the alleged deficiency. Marcus Thurman Wade v. State, No. M2019-00716-CCA-R3-PC, 2021 WL 1886189, at \*15 (Tenn. Crim. App. at Nashville, May 11, 2021), perm. to appeal denied, (Tenn. Sept. 22, 2021).

On appeal, the Petitioner contends that the post-conviction court should not have accredited trial counsel's testimony. In support of his contention, the Petitioner asserts that that trial counsel's testimony at the post-conviction hearing indicated that his memory was defective. Specifically, the Petitioner contends that trial counsel was unable to recall the jury verdict forms, whether other attorneys sat with him at the counsel table, the size of the jury pool, "whether the trial judge removed the black juror after voir dire on the grounds that she knew someone who was related to [the Petitioner]," and whether the jury was sent back to deliberate on issues of drug quantity and the school zone violation. Our supreme court has held that

> appellate courts are bound by the post-conviction court's underlying findings of fact unless the evidence preponderates against them. Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court. Appellate courts must generally defer to a post-conviction court's findings concerning witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence.

Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). The record does not preponderate against the post-conviction court's factual findings.

In the post-conviction court, the Petitioner contended that trial counsel was ineffective by failing to object after the State asked the trial court to have the jury return to

- 14 -

the jury room to determine the amount of drugs the Petitioner possessed and whether the sale and delivery occurred in a drug-free school zone. On appeal, however, the Petitioner again raises this complaint and adds a contention that his due process rights against double jeopardy were violated when the trial court allowed further deliberations by the jury, which the Petitioner contends constructively amended the indictment after the jury rendered its verdict. However, in the Petitioner's appellate brief, post-conviction counsel concedes that "the controlling case law in Tennessee appears to be adverse to your Petitioner's contentions on this point." We agree that when a jury returns an incorrect or imperfect verdict, the trial court has both the power and the duty to send them back to the jury room with directions to amend the verdict to put it in the proper form. State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994) (citing State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993)), abrogated by State v. Saylor, 117 S.W.3d 239 (Tenn. 2003). The Petitioner is not entitled to relief on this basis.

The Petitioner contends that trial counsel was ineffective by failing to fully litigate his suppression issues. The Petitioner maintains that he did not give Officer Baldwin permission to "search" the car, asserting that, instead, he unlocked the car so Officer Baldwin could merely "look" inside the car. The Petitioner maintains that the window tint was the sole basis for the stop; therefore, trial counsel's failure to effectively cross-examine Officer Baldwin "on the issue of consent to search the vehicle" and trial counsel's failure to argue to the jury regarding the propriety of the stop fell "below the expected minimum competency expected of criminal defense attorneys."

The State responds that trial counsel attacked the constitutionality of the search of the car. The State further responds that the Petitioner failed to question trial counsel about his failure to argue to the jury that the stop was illegal. Trial counsel argued at the suppression hearing that Officer Baldwin searched the vehicle without a warrant or consent and that the search was, therefore, presumed to be unreasonable. Nevertheless, at the conclusion of the suppression hearing, the trial court held that the Petitioner had consented to the search. Despite the denial of the motion to suppress, trial counsel continued to challenge the traffic stop and the search via a motion to reconsider, contending that the officers should not have pursued the Petitioner onto private property.

The post-conviction court found that "the suppression issue was hotly litigated" by trial counsel on the Petitioner's behalf. The post-conviction court also found that the Petitioner was "really relitigating the suppression issue instead of demonstrating any deficiency in [trial counsel's] representation." The post-conviction court concluded that the Petitioner's contention that Officer Baldwin was obligated to "abandon" the issue of the window tint violation once the Petitioner pulled onto private property was "faulty." The post-conviction court correctly noted that Officer Baldwin saw the violation while the Petitioner was driving on a public road and that the officer had no obligation to stop

following the Petitioner simply because the Petitioner turned onto his driveway. The post-conviction court held, accordingly, that trial counsel was not deficient.

The Petitioner acknowledged that at the suppression hearing, trial counsel and the State debated whether a stop for a window tint violation was valid even after the suspect had arrived at his or her destination. The Petitioner further acknowledged that trial counsel filed a motion to suppress and an amended motion to suppress, and the record reflects that trial counsel vigorously argued the motions in the trial court. Trial counsel was not deficient merely because his arguments were unavailing. Therefore, the Petitioner is not entitled to relief on this issue.

The Petitioner also contends that trial counsel was ineffective by failing to thoroughly cross-examine Officer Baldwin. However, the Petitioner failed to call Officer Baldwin as a witness at the post-conviction hearing or to allege what questions the officer should have been asked. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit this witness might have offered to the Petitioner's case, nor may we guess as to what evidence further investigation may have uncovered. Id. Accordingly, the Petitioner has failed to demonstrate prejudice in this regard.

Finally, the Petitioner alleges that he is entitled to relief under the cumulative error doctrine. However, as we have found no errors, much less cumulative ones, we conclude that the Petitioner is not entitled to relief.

## III. Conclusion

We affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

- 16 -